# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**NILDA FELMEY**
        **Plaintiff,**

    **v.**                           **Case No. 13-C-219**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
                   **Defendant.**

---

## DECISION AND ORDER

Plaintiff Nilda Felmey applied for disability benefits, but the Social Security Administration ("SSA") denied her application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") after a hearing. The Appeals Council then declined review, making the ALJ's ruling the final decision of the Commissioner on plaintiff's application. *See Pepper v. Colvin*, 712 F.3d 351, 361 (7th Cir. 2013). Plaintiff now seeks judicial review of the ALJ's decision.

## I. STANDARD OF REVIEW

"On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). Under this deferential standard, the court may not re-weigh the evidence or substitute its judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering his decision, the ALJ must build a logical bridge from the evidence

to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence.  Pepper, 712 F.3d at 362.

## II. STANDARD FOR DETERMINING DISABILITY

To determine whether a claimant is disabled, an ALJ employs a five-step inquiry, which asks: (1) whether the claimant is currently employed; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's impairment is one that the Commissioner considers conclusively disabling;[1] (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work; and (5) if the claimant cannot perform her past work (or if she lacks a relevant work history), whether she is capable of performing any other work in the national economy.  See, e.g., Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012).  The claimant bears the burden of proof at steps one through four, but at step five the burden shifts to the Commissioner.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The Commissioner may satisfy this burden through testimony from a vocational expert ("VE") regarding jobs someone with the claimant's limitations can perform.  See, e.g.,

---

[1]These conclusively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").  To meet or equal a listed impairment, the claimant must satisfy all of the "criteria" of a particular Listing.  Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999).  For instance, in order to meet the mental impairment Listings for Affective Disorders (12.04) or Anxiety-Related Disorders (12.06), the claimant must demonstrate the necessary degree of limitation under the "paragraph B criteria": (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.  The degree of limitation in the first three areas is evaluated on a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth area (episodes of decompensation) on a four-point scale: none, one or two, three, and four or more.  20 C.F.R. § 404.1520a(c).  In order to be considered disabled, at least two of the following must be present: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of concentration, persistence, and pace; or (4) repeated episodes of decompensation each of extended duration.  Larson v. Astrue, 615 F.3d 744, 748 (7th Cir. 2010).

2

Britton v. Astrue, 521 F.3d 799, 803 (7th Cir. 2008).

## III. FACTS AND BACKGROUND

### A.    Plaintiff's Application and Supporting Materials

In September 2011, plaintiff applied for benefits, alleging a disability onset date of July 1, 2009.  (Tr. at 151, 155, 195.)  The SSA employee who assisted plaintiff indicated that plaintiff "was crying since the moment she sat until the end of the interview.  Never made eye[] contact, was answering [with] soft voice, refused to talk for awhile until the [employee] told her that she has to talk or the interview would stop."  (Tr. at 196.)  Asked if she could speak and understand English, plaintiff said "yes," but asked if she could read and understand English she said "no."  (Tr. at 198.)  In her disability report, plaintiff indicated that she could not work due to depression, high blood pressure, "something [found] in my lung and breast but they do not know what [it] is," severe headaches, and back pain.  (Tr. at 199.)  She indicated that she stopped working on September 15, 2011, because of her conditions, but that her conditions caused her to make changes in her work activity as of July 1, 2009, and she had not earned more than $980/month since then.  (Tr. at 199.)  She reported working as a packer for various temporary services between 2003 and 2011.  (Tr. at 200.)

In a function report (which was actually completed by plaintiff's daughter (Tr. at 216)), plaintiff indicated that she lived alone in a house.  She reported that she had high blood pressure and depression, and that any type of movement caused shortness of breath.  When she got short of breath, she had to sit or lay down.  Her blood pressure also increased with stress.  (Tr. at 209.)  On a typical day, she got up, took her medication, and tried to make something to eat and perform daily chores, but she found it difficult, started getting short of

3

breath, and had to lay down. She reported no problems with most personal care activities. (Tr. at 210.) She indicated that she was able to prepare her own meals but became tired and short of breath when standing too long. (Tr. at 211.) She denied doing any house or yard work because of fatigue and shortness of breath. (Tr. at 211-12.) She rarely went out and not alone because she could not walk too fast or too long. Her daughter helped her with shopping. (Tr. at 212.) She listed hobbies of sewing and watching TV. She spent time with her daughters when they came by to help around the house or buy food. (Tr. at 213.) She indicated that she could lift only ten pounds and walk only ten feet before she had trouble breathing. She indicated that she could pay attention for about twenty minutes, became frustrated easily, and gave up quicky, but followed spoken instructions well. (Tr. at 214.) She stated that she got along well with others but handled stress and changes in routine poorly. (Tr. at 215.) She reported taking Paroxetine (Paxil), which made her light headed and nauseous. (Tr. at 216.)

In a later disability report completed in December 2011, the SSA interviewer noted that when asked questions plaintiff would grab her face and had a hard time answering and concentrating. She appeared to get flustered when she was unable to answer. (Tr. at 218.) Plaintiff reported anxiety attacks, which prevented her from going out or being around other people, indicating that she had been diagnosed with anxiety and severe depression in September 2011. (Tr. at 220.) She reported emergency room visits for anxiety attacks in September and November 2011. (Tr. at 221.) In a third disability report from March 2012, plaintiff reported hearing voices since December 2011. (Tr. at 241.)

4

**B.**     **Medical Evidence**

   **1.**     **Treatment Records**

On February 13, 2011, plaintiff went to the St. Francis Hospital emergency department ("ED") with complaints of chest pain and cough. (Tr. at 260.) She also complained of low back pain. (Tr. at 261.) Doctors diagnosed early pneumonia (Tr. at 262) and discharged plaintiff the same day in good condition with a prescription for Azithromycin (Tr. at 263-65).

On August 4, 2011, plaintiff went to the Aurora Walker's Point Community Clinic, complaining of depression. Her blood pressure measured at 150/110. (Tr. at 336.) Plaintiff indicated that she took Paxil about seven years ago, finding it helpful. Based on her intermittent depression, she wanted to restart Paxil. She complained of trouble with her boyfriend but denied abuse. Dr. Carolyn McCarthy diagnosed depressive disorder, starting plaintiff on Paraxetine (Paxil). (Tr. at 337.)

On August 18, 2011, plaintiff went to the St. Francis ED with complaints of high blood pressure (180/100) and cough. She also complained of increased anxiety and depression. She reported that she had been seen at the Walker's Point free clinic for depression, was told that her blood pressure was high and she was about to have a stroke, which made her more anxious. (Tr. at 268.) Dr. Donald Dixon noted a normal psychiatric evaluation, with normal interpersonal interactions and appropriate affect and demeanor. He found her symptoms consistent with acute bronchitis/chest cold (Tr. at 270, 272) and discharged plaintiff the same day in good condition with a prescription for Hydrochlorothiazide, a "water pill" used to treat

5

high blood pressure,[2] and Guaifenesin, used to relieve chest congestion[3] (Tr. at 271, 274).

On September 2, 2011, plaintiff returned to the Walker's Point Clinic for recheck of her blood pressure, with a reading of 156/100. She had a counseling appointment but did not attend because she was working. She further indicated that she took Paroxetine for a few days but then stopped because it made her feel tired and dizzy. She reported working as a packer through an agency, seven days a week if she can. She declined to reschedule the counseling session. Dr. McCarthy noted: "She feels generally well and has no concerns." (Tr. at 342.) Dr. McCarthy prescribed Lisonopril for high blood pressure and referred plaintiff to the Sixteenth Street Clinic for continuing care. (Tr. at 342.)

On September 5, 2011, plaintiff went to the St. Francis ED with complaints of dizziness and high blood pressure, with a reading of 213/97 on arrival. (Tr. at 282-83.) An EKG was normal (Tr. at 285), and she was discharged home (Tr. at 286).

On September 13, 2011, plaintiff returned to the Walker's Point Clinic, reporting that she went to the ED for high blood pressure and was found to have a spot on her lung, which frightened her. She also reported that she could not tolerate Paxil. She denied depression but cried throughout the exam. (Tr. at 343.) Dr. Neil Moecker assessed severe anxiety, depression "which she won't admit to"; hypertension, currently controlled; and an abnormal chest x-ray. He continued her on Lisonopril and prescribed Lozazepam for anxiety[4] and

---

[2]http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html.

[3]http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682494.html.

[4]See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html.

6

Fluoxetine (Prozac) for depression.[5]  (Tr. at 344.)[6]

On September 22, 2011, plaintiff returned to the Walker's Point Clinic for recheck of her blood pressure.  She reported taking medications as prescribed but indicated that she felt very depressed and very anxious when alone in her apartment.  Plaintiff also reported hearing voices complaining to her but not telling her to do anything; she was afraid to go into the basement because of noises.  She also reported anxiety due to her chest x-ray and mammogram.  Plaintiff reported thoughts of self-harm but no plan.  She cried for much of the visit. Dr. Jeffrey Luecke increased Fluoxetine, and plaintiff was to see a counselor the following day.  (Tr. at 345.)[7]

On October 3, 2011, plaintiff returned to the Walker's Point Clinic, with a chief complaint of depression.  (Tr. at 346.)  She expressed interest in seeing a counselor again.  Dr. McCarthy increased Fluoxetine and scheduled an appointment with the first available counselor.  (Tr. at 347.)

On November 2, 2011, plaintiff went to the St. Luke's emergency room ("ER") for hypertension, with associated symptoms of palpitations, anxiety, and dizziness.  (Tr. at 372.) Her blood pressure measured at 182/90.  (Tr. at 373.)  On exam, she displayed normal mood and affect, normal behavior, and normal judgment and thought content.  (Tr. at 374.)  Paul Streiff, PA-C, and Michelle Heibert, MD, assessed hypertension, out of control.  (Tr. at 376.)

---

[5]See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html.

[6]On September 16, 2011, plaintiff underwent a mammogram, which revealed some dense tissue.  The radiologist recommended magnification views.  (Tr. at 321-22.)

[7]Further breast scans taken on September 28, 2011, showed the calcifications to be benign, but several cysts were seen bilaterally.  (Tr. at 323-24.)  Biopsies performed on September 30, 2011 identified no carcinoma.  (Tr. at 327-30, 365-67.)

7

A chest x-ray showed no acute cardiopulmonary disease. (Tr. at 377.)

On November 3, 2011, plaintiff went to the Sixteenth Street Behavioral Health Center. She reported going to the ER the previous evening for high blood pressure, depression, and anxiety. Plaintiff's daughter indicated that plaintiff needed to control anxiety to lower her blood pressure. Plaintiff requested refill of medications. Rachel Vogelgesang, PA, noted a history of depression and anxiety for many years, now improved with medications. (Tr. at 356.) She prescribed Lorazepam.[8] (Tr. at 359.)

On November 7, 2011, plaintiff went to the Sixteenth Street Clinic to establish care and obtain a refill of her blood pressure medication. She reported that her anxiety was better on benzodiazepines. She also reported taking SSRIs, with no side effects; she thought this helped but she had always been seen in ERs or free clinics. (Tr. at 360.) Dr. Meghan Duffie assessed hypertension, depression, and generalized anxiety disorder (Tr. at 363), prescribing Fluoxetine for anxiety and Lisinopril for hypertension, and arranging a psychiatric consult for medication management (Tr. at 364).

On December 14, 2011, plaintiff began receiving psychiatric treatment from Richard Broach, APNP, at the Sixteenth Street Behavioral Health Center, receiving prescriptions for Trazodone, Fluoxetine, and Lorazepam. (Tr. at 402, 418.) On that same date, a provider from the Sixteenth Street Community Health Center with an illegible signature completed a certificate to return to school/work, indicating that plaintiff "is my patient and has been under my care today, 12-14-2011 and is able to return to work on Dec 14, 2011." (Tr. at 403.)

---

[8]Lorazepam (Ativan) is used to relieve anxiety. Lorazepam is in a class of medications called benzodiazepines. It works by slowing activity in the brain to allow for relaxation. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html.

On January 18, 2012, plaintiff returned to the Sixteenth Street Behavioral Health Center, advising Mr. Broach that she had been crying a lot and did not want to do anything. She also reported hearing voices. She indicated that she missed having her own apartment, her own privacy. In his assessment, Mr. Broach reported recent discontinuation of Trazodone for sleep after only two days due to "feeling down"; and major depression, recurrent, with psychotic features. Plaintiff remained at the same levels and showed no improvement; her sleep, appetite, and energy remained poor. She declined to accept individual counseling. Mr. Broach changed from Trazodone to Zolpidem for sleep and continued Fluoxetine. Plaintiff was using Lorazepam only once daily at night. (Tr. at 418.) Broach considered an increase of Fluoxetine and augmentation with Budeprion or Seroquel if plaintiff's depression did not improve. (Tr. at 419.) He also encouraged individual therapy. (Tr. at 420.)

On February 16, 2012, plaintiff saw Dr. Duffie, who noted that plaintiff's hypertension was controlled on her current medications. Regarding the pulmonary nodule previously discovered, plaintiff elected to follow up with an x-ray rather than a CT scan due to cost/lack of insurance. (Tr. at 459.) Plaintiff also saw Mr. Broach that day, indicating that she wanted to stay in her room and not leave. She also reported missing having her own house. Mr. Broach diagnosed major depression, recurrent, with psychotic features. Plaintiff reported near 100% adherence to medications, and Mr. Broach noted a slight improvement in her depression level. Her sleep was also improved. However, she remained isolated, fixated on what she had lost. (Tr. at 421.) Mr. Broach urged her to look for reasons to give thanks in the midst of her problems and to initiate individual therapy. (Tr. at 422.) He continued her on Fluoxetine, Lorazepam, and Zolpidem. (Tr. at 423.)

On March 1, 2012, plaintiff saw Deborah Contreras Tadych, Ph.D, on referral from Mr.

Broach, for individual therapy. Plaintiff complained of decreased concentration, social isolation, and auditory hallucinations. She reported depression for many years, with the first episode about ten years ago. (Tr. at 424.) She reported living with her oldest daughter and missed having her own house. She indicated that she lost her job due to her depression and reported going to the ER several times because of anxiety. (Tr. at 425.) Plaintiff reported hallucinations, but her memory was unimpaired, executive functions not decreased, and problem-solving skills not impaired. Attention demonstrated no abnormalities, and thought content revealed no impairment. Dr. Tadych assessed major depression, with a highest GAF of 55,[9] recommending individual therapy. (Tr. at 426.)

Plaintiff returned to Dr. Tadych on March 19, 2012, reporting that things were the same or worse. She did not feel the medications were working, despite taking them every day. Dr. Tadych recommended that plaintiff become active to combat depression, and plaintiff responded that she and her daughters recently submitted applications to join a gym. Plaintiff then became withdrawn, reporting that the voices were worse, telling her to give up and take all her pills so she won't wake up. Dr. Tadych called in plaintiff's daughter, who agreed to take the medications and dole them out as needed. (Tr. at 428.) Dr. Tadych concluded that plaintiff's symptoms appeared to be worsening, with increased depression and auditory hallucinations. (Tr. at 429.)

On April 5, 2012, plaintiff saw Mr. Broach, reporting that the pills were not working. She

---

[9]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 51-60 reflect "moderate" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

stated: "You've got to give me a piece of paper that says I can't work. I can't leave my house. I get panicky if I do." (Tr. at 489.) Mr. Broach assessed major depression, recurrent with psychotic features, and panic disorder without agoraphobia. She reported near 100% compliance and denied any adverse drug reactions. Mr. Broach indicated that plaintiff remained at the same level of mood disturbance. She was stuck in the past with daily rumination of offenses and hurts. She had high expectations that medications must do something for her yet little motivation to do much for herself. She seemed to be holding on to anger about the way life treated her, which drained her energy, absorbed her attention, and kept her trapped in herself. Mr. Broach added Seroquel as an adjunct to the Fluoxetine and to address persistent auditory hallucinations. (Tr. at 489.) He stressed that the medications were "training wheels, not motors," challenged plaintiff, "What are you willing to do for your medications so they can help you?", and reinforced the importance of behavioral activation. (Tr. at 490.) On exam, she was oriented to time, place, and person, with coherent, logical, connected thought processes. She did report auditory hallucinations calling her name, but her insight was good and her judgment sound. (Tr. at 490.) Mr. Broach prescribed Seroquel, Fluoxetine, Lorazepam, and Zolpidem. (Tr. at 491.)

On April 10, 2012, plaintiff saw Dr. Duffie, complaining of knee pain. Dr. Duffie referred her to a specialist and recommended ice/heat/elevation and Acetaminophen. (Tr. at 461.)

On April 23, 2012, plaintiff returned to Dr. Tadych, reporting that things were the same; she continued to be extremely depressed and anxious. Plaintiff and her daughter's application for reduced fee gym membership had been declined, so they had not gone to the gym. Nor had they engaged in other activities such as taking walks or going to rummage sales because the weather had been cold. Plaintiff further reported being upset because the daughter she

11

lived with planned to return to Puerto Rico. (Tr. at 487.) Dr. Tadych assessed major depression, recurrent with psychotic features, and panic disorder without agoraphobia. Plaintiff continued to be extremely depressed and hopeless. Despite the support she appeared to have from her daughter she continued to be stuck in the past. Dr. Tadych wrote: "Appears skeptical that she will be able to follow through on activities that we have identified." (Tr. at 488.)

On April 29, 2012, plaintiff was admitted to the Aurora Health Care inpatient behavioral health center on a voluntary basis for assessment of depressed mood, ideas of helplessness and hopelessness, and suicidal thoughts with plan to overdose on medication or cut her wrist. Dr. Srikrishna Mylavarapu stopped Prozac, as plaintiff reported it was not working, starting Effexor (Venlafaxin); stopped Seroquel and started Geodon; and continued Lisinopril and Zocor without change. With the medication and going to groups, plaintiff started improving; a family session with her three daughters went very well. By May 3, 2012, plaintiff was very pleasant and cooperative, denying any suicidal thoughts or psychotic symptoms. She was discharged home in stable condition, with diagnoses of major depressive disorder, generalized anxiety disorder, and a GAF of 60. (Tr. at 495-96.) She was to follow up with Mr. Broach and Dr. Tadych. (Tr. at 465-68, 497-500.)

On May 8, 2012, plaintiff saw Mr. Broach, reporting that she went to the hospital because she felt chest tightness, trouble breathing, and elevated blood pressure, and was admitted for several days, receiving medicine for anxiety and depression. Plaintiff indicated that the other day she woke up and did not recognize her daughters. She sometimes heard sounds, but less than she used to. She was sleeping OK, using Zolpidem when she had trouble. She reported near 100% compliance with medications and no side effects. (Tr. at 484.) She continued to isolate, ruminate, and catastrophize, which perpetuated her depression

12

and triggered anxiety. She showed little to no self-initiative to put therapy plans into practice. She showed a slight change in affect, more responsive to interaction. Mr. Broach discontinued Geodon and continued Seroquel but with a decreased dose; he discontinued Fluoxetine and continued Venlafaxin (Effexor); and continued Lorazepam. On exam, plaintiff was oriented to time, place, and person, with coherent, logical thought processes, and no delusions or hallucinations. (Tr. at 485.) Her insight was poor but her judgment sound. (Tr. at 486.)

On May 10, 2012, plaintiff saw Dr. Tadych, who noted that plaintiff came to the session with her hair and makeup done, and reported things were going slightly better. Plaintiff's daughter planned to move to Puerto Rico with her children, and plaintiff reported that she would move in with another daughter if this one left. She related spending three days in the hospital the previous week for anxiety, and her medications were changed. (Tr. at 481.) On exam, she was oriented to time, place, and person, with no hallucinations, unimpaired memory, executive functions not decreased, and problem-solving skills not impaired. Her affect was flat and restricted, but she displayed no abnormalities in attention and no impairment in thought content. Overall, plaintiff seemed to be experiencing slight improvements, as evidenced by the changes in her physical appearance. She continued to be quiet and reserved but did offer more spontaneous conversation. (Tr. at 482.)

Plaintiff returned to Dr. Tadych on June 6, 2012, reporting that in some ways she felt better but in others worse. She cried more than ever. She reported conflict with her daughter over the daughter's contact with her father, who was abusive to plaintiff. (Tr. at 479.) Dr. Tadych assessed major depression, recurrent with psychotic features, and panic disorder without agoraphobia. The re-emergence of her ex had brought back many bad memories of her abusive relationship, which worsened her self-esteem. Dr. Tadych encouraged her to stay

13

active and take her medications.  (Tr. at 480.)

On June 21, 2012, plaintiff told Dr. Tadych that she was feeling a bit better.  She had been going to the park and spending time with her grandchildren.  Her social security hearing was coming up, and she hoped she would be approved so she could get her own place.  They discussed being prepared for not getting approved to avoid disappointment.  (Tr. at 477.)  Plaintiff was taking some steps to work on her depression – going for walks, doing hair/makeup/nails, etc. – but continued to report feeling depressed.  She continued to engage in pessimistic and ruminating thoughts.  The plan going forward was to work on becoming more active and utilizing anxiety reduction techniques, as well as taking medications as prescribed.  (Tr. at 478.)

On July 11, 2012, plaintiff saw Mr. Broach, reporting suicidal thoughts.  Plaintiff indicated that she did not want to live with her other daughter because she expected plaintiff to take care of her child and do the housework.  (Tr. at 474.)  She also reported running out of medications due to lack of funds.  Mr. Broach indicated that plaintiff had worsened in depression, improved slightly in anxiety, and stayed the same in anger.  Her living situation was the primary source of stress and mood disturbance, compounded by financial difficulties.  She was showing some initiative by doing exercise at home.  (Tr. at 474.)  Mr. Broach continued her on Lorazepam, Effexor, and Zolpidem.  (Tr. at 476.)

On August 1, 2012, plaintiff saw Dr. Tadych, reporting that things were not going well.  She did not like her living situation, as she did not get along as well with the daughter with whom she was staying as with the others.  She hoped to be approved for disability so she could get her own place.  She had not been following the activity plan (exercise, etc.) they discussed, but she did report compliance with medications.  (Tr. at 472.)  Dr. Tadych indicated that plaintiff

14

"continues to remain almost paralyzed by the depression. Has been a struggle even to pay for meds, because she has no money. All her hope seems to be placed on next court date in Oct. for SSI hearing." (Tr. at 473.)

On August 7, 2012, plaintiff advised Mr. Broach that not much had changed; she stayed in her room and cried until she could not cry anymore. Plaintiff reported spending a lot of time alone or caring for her grandchildren. She also stated: "My daughter doesn't do anything. I have to do it all. I have to cook, clean, take out the trash." (Tr. at 469.) Plaintiff indicated that she wanted her own place. She also reported feeling nervous and panicky when she went out. Even though she had family, no one visited. She also complained of not sleeping well; the Zolpidem helped at first but no longer. Plaintiff reported near 100% compliance with medications. Mr. Broach indicated that plaintiff remained basically in the same ranges of mood disturbance. She continued to isolate and hold on to anger over changes in her life. "Does not seem to be putting forth much effort on her own to improve." (Tr. at 469.) Due to her complaints of not sleeping, Mr. Broach switched her from Zolpidem to Temazepam (Tr. at 470), continuing other medications (Tr. at 471).

### 2. State Agency Consultants

On November 11, 2011, Pat Chan, M.D., reviewed the medical evidence of record and concluded that plaintiff had no physical impairments that significantly limited her functional capacity. (Tr. at 383.)

On November 14, 2011, Joan Kojis, Ph.D, completed a psychiatric review technique form ("PRTF"), evaluating plaintiff under Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders), but finding no severe mental impairment. (Tr. at 384.) Dr. Kojis found mild restriction of activities of daily living, social functioning, and concentration,

persistence, and pace, and no episodes of decompensation. (Tr. at 394.) Dr. Kojis noted that plaintiff received no mental health treatment or medications until August 2011, and she was working full-time up to seven days per week until September, when she was found to have a nodule on her lung and cyst in her breast, with an increase in stress, depression, and anxiety at that time. Dr. Kojis concluded that plaintiff's physical conditions led to an increase in depression and anxiety, resulting in no more than mild limitations. Dr. Kojis thus found plaintiff's mental impairments not severe. (Tr. at 396.)

On February 13, 2012, plaintiff saw Jeffrey Polczinski, Psy.D., for a mental status evaluation. Plaintiff's daughter, who accompanied plaintiff to the evaluation, indicated that plaintiff lost her job in August 2011. She had been feeling exhausted at work and complained of dizziness. Plaintiff stated, "I have always had depression," noting that after she lost her job she had to move in with her daughter. Plaintiff also complained of panic attacks. She related that she had been treated for depression about nine years ago while living in Michigan, taking Paxil. (Tr. at 411.) She reported taking medications again for the past six months, with full compliance. However, Dr. Polczinski noted that plaintiff had been prescribed sixty Fluoxetine on November 7, 2011, and several remained. Asked about this, plaintiff shrugged and stated, "I don't know, I take the ones they give me." (Tr. at 412.) Plaintiff reported leaving school in the seventh grade and had not obtained her GED. She thought she may be able to read and understand the newspaper. She worked for nine years in factories, last working seven months ago for temporary agencies. She reported difficulties at work as she got angry at others; any time someone told her something she would go to the bathroom and cry. (Tr. at 412.) Plaintiff's daughter indicated that plaintiff did some household chores, such as dishes and cooking. She was able to do laundry and attend to her hygiene independently. Plaintiff stated

16

that she did no cooking, did laundry when she felt OK, and her daughter did all the cleaning. Plaintiff reported a good relationship with her daughters and grandchildren.  (Tr. at 413.)

On mental status evaluation, Dr. Polczinski found that plaintiff's presentation suggested some exaggeration of difficulties: plaintiff's daughter described plaintiff as more active, with greater social interaction, than plaintiff did, and plaintiff provided rather inconsistent statements with regard to her history of depression.  Her stream of mental activity seemed appropriate. She complained of auditory hallucinations but her thinking was not delusional.  (Tr. at 414.) She was frequently tearful, and her mood did appear depressed.  She reported frequent crying spells, anhedonia, and social withdrawal.  She was oriented to person, place, and time, and her memory appeared to be intact.  In his assessment, Dr. Polczinski indicated that there appeared to be some exaggeration in her presentation, and that it was questionable whether she was fully compliant with medications.  (Tr. at 415.)  He concluded:

> Her presentation would suggest adequate ability to understand simple directions put to her.  She appears to have adequate memory as well as attention and concentration for routine tasks.  She does indicate an increase in irritability, which may adversely affect her social functioning within the work environment.  She may have mild-to-moderate impairment here.  She also appears to have mild-to-moderate limitations with regard to her ability to manage stress and/or change. Perseverance adversely affected by the same.  It would appear that her prognosis would improve with full medication compliance and perhaps psychotherapy.

(Tr. at 416.)  Dr. Polczinski diagnosed depressive disorder, NOS, and anxiety disorder, NOS, with a GAF of 50 to 55.  (Tr. at 416.)

On March 22, 2012, Kyla King, Psy.D, completed a PRTF, also evaluating plaintiff under Listings 12.04 and 12.06, finding mild restriction of activities of daily living and social functioning; moderate difficulties in concentration, persistence, and pace; and no episodes of decompensation.  (Tr. at 437, 447.)  In a mental RFC report, Dr. King found moderate

17

limitations in plaintiff's ability to understand, remember, and carry out detailed instructions, but no significant limitations in other areas. (Tr. at 433-34.) Also on March 22, 2012, George Walcott, M.D., reviewed the evidence and affirmed the previous physical assessment. (Tr. at 451.)

## C.    Hearing Testimony

On June 22, 2012, plaintiff appeared pro se for her hearing before the ALJ. (Tr. at 52.) The ALJ delayed the hearing for a translator, as it appeared plaintiff had a hard time with English, and so plaintiff could obtain a representative. (Tr. at 54, 57.)

### 1.    Plaintiff's Testimony

On October 22, 2012, plaintiff appeared with counsel for her continued hearing. (Tr. at 32.) Plaintiff testified that she was not working and could not remember the last time she worked. (Tr. at 37.) She indicated that she had lived with her daughter since August 2011. (Tr. at 37-38.) She no longer received unemployment compensation and could not recall when it ended. Plaintiff testified that she had been hospitalized for mental health issues, her attorney indicated from April 29, 2012, to May 3, 2012. (Tr. at 38.) Plaintiff's counsel also related hospitalizations related to anxiety in February 2011 and September 2011 (Tr. at 39-40), but the ALJ responded that those records referred to hypertension, not anxiety, and appeared to be emergency room visits (Tr. at 41).

The ALJ asked plaintiff whether she recalled how her last job ended, and plaintiff indicated that she was always crying at work and experienced a lot of back pain. (Tr. at 42-43.) She denied any treatment for back pain. (Tr. at 43.)

18

### 2.    VE's Testimony

The ALJ also summoned a VE, who testified that she had reviewed the file to familiarize herself with plaintiff's vocational background.  (Tr. at 43.)  The VE classified plaintiff's past work as a hand packager as medium, unskilled work.  However, it appeared that plaintiff had worked only part-time.  (Tr. at 44.)

The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, with no exertional limitations but limited to simple, routine, repetitive tasks.  (Tr. at 44.)  The VE testified that such a person would work as a cleaner, laundry worker, and washer.  (Tr. at 45.)  Adding further limitations of only occasional climbing of ladders, ropes, or scaffolds; in a work environment free of any fast paced production requirements; involving only simple work-related decisions with few, if any, work place changes, the identified jobs could still be done.  (Tr. at 45-46.)  Adding a limitation of no more than occasional interaction with the public, co-workers, and supervisors, the jobs also remained.  (Tr. at 46.)

### D.    ALJ's Decision

On November 16, 2012, the ALJ issued an unfavorable decision.[10]  (Tr. at 8.)   At step one, the ALJ found that, although she had some earnings in 2010 and 2011, plaintiff had not engaged in substantial gainful activity ("SGA") since July 1, 2009, the alleged onset date.  (Tr. at 16.)   At step two, the ALJ found that plaintiff suffered from the severe impairments of depression and an anxiety disorder.  (Tr. at 16.)  He found non-severe plaintiff's hypertension, as it was controlled by medication and caused no work-related limitations; her breast mass and

---

[10]He also sent a copy of the denial in Spanish.  (Tr. at 11.)

19

lung nodule, as neither lasted the requisite twelve months or caused any work-related limitations; and her back pain and headaches, as she received little if any treatment for these conditions and the record contained no medical findings substantiating any work-related limitations. (Tr. at 17-18.)

At step three, the ALJ found that plaintiff's mental impairments did not meet a Listing. Specifically, he found mild restriction of activities of daily living, as the record demonstrated that plaintiff could cook, clean, shop, sew, care for her grandchildren, and perform her own self-care. (Tr. at 18.) The ALJ found moderate difficulties in social functioning, based on plaintiff's reported anxiety in public places like grocery stores. However, the ALJ noted that plaintiff was able to go to the hospital and doctor's offices without incident, she applied to join a gym, and she was able to maintain friendships and a good relationship with her daughters and grandchildren. (Tr. at 18.) With regard to concentration, persistence, and pace, the ALJ found moderate difficulties. While plaintiff reported difficulty remembering things and sometimes had auditory hallucinations, she had the ability to focus well enough to sew, read a newspaper, watch movies, and handle her finances. (Tr. at 18.) Finally, the ALJ found that plaintiff experienced one to two episodes of decompensation of extended duration, based on her April 2012 hospital admission after exhibiting suicidal ideation. (Tr. at 18.) Plaintiff had been treated in emergency rooms for hypertensive episodes, which she related to anxiety attacks, but these were not of extended duration. (Tr. at 18-19.)

At step four, the ALJ found that plaintiff retained the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: climbing of ladders, ropes, and scaffolds only occasionally; simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple, work-related

20

decisions, with few, if any, work place changes; and involving only occasional interaction with the public, co-workers, and supervisors. (Tr. at 19.) In making this finding, the ALJ considered plaintiff's testimony, stating that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 20.) The ALJ later stated that, considering the entire record, plaintiff's "allegations as to disabling severity are not credible." (Tr. at 22.) The ALJ provided several reasons for his conclusion.

First, the ALJ noted that, although plaintiff alleged long-standing depression, which disabled her from work as of July 2009, she did not seek treatment until August 2011, over two years later. (Tr. at 21, 22.) Although the treatment records did not indicate that plaintiff's depression and anxiety significantly improved with therapy and medication, she did experience fewer hallucinations, and the providers generally indicated that her symptoms were only moderate in severity. (Tr. at 21.) The ALJ further noted that the treatment records suggested that any exacerbations stemmed from temporary emotional stressors, like trouble with her boyfriend and housing concerns. (Tr. at 22.)

Second, the record showed that plaintiff continued to work, albeit below SGA levels, through 2011. She also received unemployment benefits in 2010 and 2011, which required her to certify that she was able to work, contrary to her claims of disability in this proceeding. (Tr. at 22.)

Third, the record contained evidence that plaintiff exaggerated the severity of her

condition. (Tr. at 22.) For instance, the consultative examiner noted the different versions of plaintiff's daily functioning provided by plaintiff and her daughter. Dr. Polczinski also questioned whether plaintiff was fully compliant with her medications, opining that, if fully compliant, her condition would improve. (Tr. at 21.) Plaintiff's mental health provider noted that, after plaintiff reported that her pills were not working, she asked for a statement certifying she could not work. The provider also indicated that plaintiff needed to show more initiative and follow her therapy plan to try to reduce her symptoms. (Tr. at 22.)

Fourth, the ALJ noted that plaintiff's daily activities were not limited to the extent one would expect given her complaints of disabling symptoms and limitations. For instance, in her October 2011 function report, plaintiff reported living alone in a house; she prepared meals, shopped, sewed, and handled money. For a period of time she lived with one of her daughters, where apparently not much was required of her. However, by August 2012, she had moved in with another daughter, indicating to a provider that she cared for her grandchildren, cooked, cleaned, and took out the trash; "I have to do it all." (Tr. at 21.) Contrary to the allegation that she was "homebound," the record suggested that plaintiff wanted to get her own apartment because she was upset that her daughter expected her to do all the chores. (Tr. at 22.)

Finally, the ALJ noted the lack of any opinions from treating or examining physicians that plaintiff was disabled or had greater limitations. (Tr. at 22.) The record contained a statement that plaintiff was released to return to work after seeing a doctor on December 14, 2011. (Tr. at 22.) Given plaintiff's allegations of disabling symptoms, the ALJ expected to see some indication in the treatment records of restrictions placed on plaintiff. (Tr. at 22-23.)

The ALJ also considered the medical opinion evidence, assigning substantial weight to the opinion of Dr. Polczinski. (Tr. at 21.) The ALJ also gave substantial weight to the opinions

22

of the state agency psychological consultants, except as to plaintiff's social functioning, as the subsequently received evidence suggesting greater limitation in that area. (Tr. at 23.)

The ALJ concluded that plaintiff had no past relevant work, that at age forty-eight she qualified as a younger individual, and that she had a marginal education and was able to communicate in English. Considering her age, education, work experience, and RFC, the ALJ determined at step five that there were jobs that plaintiff could perform. (Tr. at 23.) The ALJ relied on the VE's testimony that a person with plaintiff's characteristics could work as a cleaner, laundry worker, and washer. The ALJ thus found plaintiff not disabled. (Tr. at 24.) On January 3, 2013, the Appeals Council denied plaintiff's request for review. (Tr. at 1.)

## IV. DISCUSSION

Plaintiff argues that the ALJ erred in evaluating her credibility, by giving substantial weight to the opinions of the state agency doctors, and in formulating RFC. I address each argument in turn.

### A. Credibility

#### 1. Standards for Evaluating Credibility

The ALJ must follow a two-step process in evaluating the credibility of a claimant's alleged symptoms. 20 C.F.R. § 404.1529(c); SSR 96-7p. First, the ALJ must determine whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce her symptoms. If she does not, the symptoms cannot be found to affect her ability to perform basic work activities. SSR 96-7p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit her ability

23

to perform basic work activities. If the claimant's statements are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of her statements based on the entire case record. SSR 96-7p.

Because the ALJ is in the best position to determine the claimant's truthfulness and forthrightness, the reviewing court will overturn an ALJ's credibility determination only if it is "patently wrong." Shideler v. Astrue, 688 F.3d 306, 310-11 (7th Cir. 2012). The ALJ must provide specific reasons for the weight given to the claimant's statements, Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009), but this duty of articulation has been described as "minimal," e.g., Arbogast v. Bowen, 860 F.2d 1400, 1407 (7th Cir. 1988). Further, even if the court finds some of the ALJ's reasons flawed, it will affirm so long as substantial evidence supports the credibility determination overall. See, e.g., McKinzey, 641 F.3d at 890-91; see also Halsell v. Astrue, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as enough of them are, see, e.g. Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009); Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000)[.]"). Only when the ALJ's determination lacks any explanation or support will the court declare it patently wrong and deserving of reversal. Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).

**2. Analysis**

As plaintiff notes, the ALJ used the SSA's "template" credibility language in this case, finding that while plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. at 20.) This is meaningless boilerplate, frequently seen in ALJ decisions but unhelpful in determining which statements the ALJ found

24

(in)credible and why. It also backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility. Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012) (citing Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012); Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010)). "Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing." Id.

However, use of the template need not always require reversal and remand. "If the ALJ has otherwise explained his conclusion adequately, the inclusion of this language can be harmless." Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012). In the present case, the ALJ went on to provide a more specific explanation for his finding. As summarized above, the ALJ found plaintiff's allegations of disabling symptoms not credible based on her failure to seek treatment for mental health problems until August 2011, more than two years after the alleged disability onset date; her continued work (albeit below SGA levels) through 2011 and her receipt of unemployment benefits in 2010 and 2011; the records from Dr. Polczinski and plaintiff's providers suggesting that plaintiff exaggerated the severity of her condition and failed to comply with treatment recommendations that would improve her situation; plaintiff's daily activities, which exceeded what one would expect given her complaints of disabling symptoms and limitations; and the absence of any opinions from treating or examining physicians that plaintiff was disabled or had greater limitations. (Tr. at 22.)

Plaintiff disputes the ALJ's rationale, but because the record contains substantial supporting evidence I must affirm. First, plaintiff attacks the ALJ's reliance on Dr. Polczinski's report, arguing that Dr. Polczinski provided no explanation for why he thought plaintiff was not in full compliance with medication and would improve if she took her pills. To the contrary, Dr. Polczinski noted that on November 7, 2011, plaintiff received sixty Fluoxetine tablets, but

25

several remained at the time of his evaluation on February 13, 2012, suggesting that plaintiff had not taken her pills as directed.  (Tr. at 412.)

Second, plaintiff argues that the ALJ skipped over evidence that despite 100% compliance with her medication she continued to feel depressed and anxious.  An ALJ is not required to discuss every piece of evidence and testimony in the record, and is precluded  only from ignoring an entire line of evidence that supports a finding of disability.  Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010).  Here, the ALJ acknowledged that plaintiff's "treatment records do not indicate that her depression and anxiety have significantly lessened with therapy and medication."  (Tr. at 21.)  However, the ALJ also cited the records from plaintiff's mental health care provider noting that, immediately after reporting that her pills were not working, plaintiff asked the provider to prepare a statement indicating that she could not work.  The provider apparently declined to do so, instead indicating that plaintiff needed to show more initiative and follow her therapy plan to try to reduce her symptoms.  (Tr. at 22, 489-90.)  Specifically, Mr. Broach explained that medicines are like "training wheels, not motors," and challenged plaintiff, "What are you willing to do for your medications so they can help you?"  (Tr. at 490.)

Third, plaintiff argues that the ALJ should not have relied on her lack of treatment prior to 2011, noting that treatment for a mental disorder is not required to prove that it is severe or disabling.  See Wilder v. Apfel, 153 F.3d 799, 802 (7th Cir. 1998).  However, the error in Wilder was the ALJ's requirement of contemporaneous medical documentation of depression alleged to have commenced years earlier; Wilder does not hold that the ALJ may not consider lack of medical treatment as a factor in his analysis.  See, e.g., Simila, 573 F.3d at 519 (explaining that while the ALJ may not reject a claimant's subjective complaints based solely on the lack of

26

objective medical support, the ALJ must consider the objective medical evidence as part of his analysis); Nicholson v. Astrue, 341 Fed. Appx. 248, 252 (7th Cir. 2009) ("This lack of treatment supports the ALJ's adverse credibility finding."); Sienkiewicz v. Barnhart, 409 F.3d 798, 804 (7th Cir. 2005) (finding that failure to seek medical treatment provided support for the ALJ's credibility finding); Griggs v. Astrue, No. 1:12-CV-00056, 2013 WL 1976078, at *7 (N.D. Ind. May 13, 2013) (approving the ALJ's reliance on the claimant's failure to seek treatment until years after the alleged onset date).  Plaintiff suggests that the ALJ should have asked whether other medical records existed, but plaintiff was represented by counsel at the hearing, and the ALJ specifically held the record open so that counsel could provide any additional records of past treatment.  (Tr. at 33-34.)[11]  Plaintiff also argues that the ALJ failed to consider any reasons why she failed to seek treatment sooner, such as inability to afford it, as SSR 96-7p requires.  Plaintiff cites notes indicating that she had trouble affording her pills in 2012, but she points to no evidence that poverty prevented her from seeking treatment prior to 2011.  See Pepper, 712 F.3d at 367 ("[W]hy a claimant failed to undergo treatment is one factor to consider when assessing an impairment, but the burden was on Pepper to explain why she was disabled as a result of her depression.").[12]

Fourth, plaintiff faults the ALJ for relying on her continued employment.  While the fact

_____

[11]See Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004) (rejecting argument that the ALJ failed to develop the record where the ALJ held the record open so that the claimant's counsel could obtain additional medical records).

[12]Plaintiff takes issue with the ALJ's statement that she did not "require any medical care for her mental condition until August 2011" (Tr. at 22, emphasis added), noting that failure to seek treatment is not the same thing as not needing it.  The ALJ may have overstated this point, but one flaw does not require reversal.  See McKinzey, 641 F.3d at 890-91 (affirming, even though two of the claimant's three attacks on the ALJ's credibility determination had some merit).

27

that someone is employed is not proof positive that she is not disabled, <u>Wilder v. Chater</u>, 64 F.3d 335, 338 (7th Cir.1995), the ALJ may reasonably consider as part of his analysis the claimant's continued work after the alleged onset date, <u>see, e.g.</u>, <u>Berger v. Astrue</u>, 516 F.3d 539, 546 (7th Cir. 2008). Similarly, plaintiff argues that the ALJ erred in relying on her receipt of unemployment benefits, as such receipt is not necessarily inconsistent with a claim of disability under the Social Security Act. The ALJ did not find that plaintiff's receipt of unemployment <u>precluded</u> a finding of disability; he simply noted it as one factor in his analysis. <u>See, e.g.</u>, <u>Schmidt v. Barnhart</u>, 395 F.3d 737, 746 (7th Cir. 2005) ("[W]e are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely <u>no</u> role in assessing his subjective complaints of disability.").[13]

Fifth, plaintiff attacks the ALJ's reliance on her daily activities. The Seventh Circuit has cautioned ALJs against placing undue weight on a claimant's daily activities, but some weight is appropriate. <u>Mendez v. Barnhart</u>, 439 F.3d 360, 362 (7th Cir. 2006). Here, the ALJ cited evidence that, when living with one of her daughters, plaintiff had to do everything around the house because her daughter did nothing. (Tr. at 21, 469.) Plaintiff contends that the ALJ failed to consider other evidence that supported her statements, but, as noted, the ALJ need not discuss in writing every piece of testimony and evidence in the record. The ALJ considered

---

[13]In reply, plaintiff notes that desperate financial straits might force a person to certify an ability to work for purposes of unemployment compensation even though she was disabled at the time. However, she points to no such evidence in this case, nor does she make any attempt to reconcile <u>her</u> unemployment application with the disability claim. <u>Cf.</u> <u>Pursell v. Colvin</u>, No. 12 CV 5455, 2013 WL 3354464, at *11 (N.D. Ill. July 3, 2013) (reversing where the ALJ relied on the claimant's receipt of unemployment without considering his need to support three children and pay a mortgage).

plaintiff's claims that she isolated herself and was essentially homebound, but noted that plaintiff wanted to get her own apartment and was upset about living with her daughter because her daughter expected her to do all the chores.  (Tr. at 22, 469.)

Finally, plaintiff argues that it was unfair for the ALJ to note the lack of a treating source statement when the ALJ did not ask for one.  As indicated, however, plaintiff was represented by counsel at the hearing.  "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making [her] strongest case for benefits." Glenn v. Sec'y of Health and Human Servs., 814 F.2d 387, 391 (7th Cir. 1987).  Further, the ALJ noted not just the lack of a treating source report but also the absence of any statements in the treatment records suggesting disabling symptoms or restrictions.  (Tr. at 22-23.)  The only treatment record discussing ability to work was a December 14, 2011, "certificate to return to school/work" signed by one of plaintiff's providers at the Sixteenth Street Clinic, which indicated that plaintiff was able to return to work on that date without any listed restrictions.  (Tr. at 22, 403.)

## B.    State Agency Doctors

### 1.    Standards for Evaluating Consultants' Opinions

The ALJ must consider the opinions of state agency medical and psychological consultants, as they "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  SSR 96-6p.  In weighing such opinions, the ALJ must consider the supportability of the opinion in the evidence, including any evidence received at the hearing level that was not before the state agency; the consistency of the opinion with the record as a whole, including other medical opinions; any

29

explanation for the opinion provided by the consultant; and any specialization of the consultant. SSR 96-6p. The court will uphold an ALJ's decision to credit a consultant's opinion, if adequately supported and explained. See, e.g., Clay v. Apfel, 64 F. Supp. 2d 774, 782 (N.D. Ill. 1999).

**2. Analysis**

In this case, the ALJ gave substantial weight to Dr. Polczinski's opinion that plaintiff had no more than moderate restrictions in her ability to do mental work-related tasks. (Tr. at 21.) The ALJ also considered the opinions of the state agency consultants who reviewed the case at the initial and reconsideration levels. The medical consultants found no severe physical impairment, while Dr. King (in her March 2012 report) found a severe mental impairment with mild restriction of activities of daily living and social functioning; moderate difficulties in concentration, persistence, and pace; and no episodes of decompensation. The ALJ gave substantial weight to these opinions, except about plaintiff's social functioning, as later records supported a moderate functional limitation in this area. (Tr. at 23.)

Plaintiff argues that the ALJ erred in finding the subsequent evidence relevant only to social functioning. Plaintiff first notes her psychiatric hospital admission from April 30 to May 3, 2012 for assessment of depressed mood, helplessness/hopelessness, and suicidal thoughts. (Tr. at 495-96.) The ALJ considered this evidence, counting the admission as an episode of decompensation. (Tr. at 18.) However, as plaintiff admits, she significantly improved during the course of the admission with medications and was discharged in stable condition with a GAF of 60, suggestive of only moderate symptoms. Plaintiff points to no evidence from this admission supporting greater, ongoing limitations.

Plaintiff also cites subsequent treatment notes from Mr. Broach and Dr. Tadych, which

30

reported ongoing problems with depression and anxiety.  However, as the ALJ noted, neither of these providers set forth any functional limitations.  (Tr. at 22.)  As the ALJ also noted, plaintiff frequently complained to Broach about her living situation, indicating that she wanted to get her own apartment and needed disability benefits in order to do so.  (Tr. at 20, 21, 22.)  Finally, as the ALJ further noted, Broach criticized plaintiff for putting forth little effort in treatment.  (Tr. at 20, 22.)

The ALJ complied with the SSR 96-6p directive that he consider whether the consultants saw the entire record, reasonably concluding that the later acquired evidence did not substantially undermine their conclusions.  He also considered the absence of any contrary opinions from treating sources.  See, e.g., Scheck, 357 F.3d at 700-01 (affirming ALJ's reliance on consultants where the claimant presented no contrary evidence).

## C.    RFC

### 1.    Standards for Determining RFC

RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in a work setting on a regular and continuing basis, i.e., eight hours a day, for five days a week, or an equivalent work schedule.  SSR 96-8p.  RFC encompasses both exertional and non-exertional functions.  Exertional capacity addresses the claimant's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. SSR 96-8p. Non-exertional capacity considers all work-related limitations and restrictions that do not depend on physical strength, including postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering

31

instructions and responding appropriately to supervision) functions.  SSR 96-8p.  The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence.  SSR 96-8p.  The court will uphold an ALJ's RFC determination if the evidence supports it and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review.  See Arnett v. Astrue, 676 F.3d 586, 591-92 (7th Cir. 2012).

### 2. Analysis

In the present case, the ALJ found that plaintiff retained the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: only occasional climbing of ladders, ropes, and scaffolds; work limited to simple, routine, and repetitive tasks in an environment free of fast-paced production requirements and involving only simple, work-related decisions, with few, if any, work place changes; and with only occasional interaction with the public, co-workers, and supervisors.  (Tr. at 19.)

Plaintiff first argues that the ALJ failed to discuss her ability to perform sustained work activities on a regular and continuing basis.  However, she identifies no specific limitations or evidence the ALJ skipped.  In any event, the cases do not require the precise articulation plaintiff suggests.  See, e.g., Knox v. Astrue, 327 Fed. Appx. 652, 657 (7th Cir. 2009) ("Although the 'RFC assessment is a function-by-function assessment,' SSR 96-8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient[.]"); Pyle v. Colvin, No. 2:12-cv-266, 2013 WL 3866730, at *6 (N.D. Ind. July 25, 2013) (explaining that under SSR 96-8p, "there is a difference between what the ALJ must contemplate and what he must articulate in his written decision"); Lewis v. Astrue, 518 F. Supp. 2d 1031, 1043 (N.D. Ill.

32

2007) ("The 'Narrative Discussion Requirements' in SSR 96-8p [do not] require a detailed function-by-function analysis that Claimant urges.").

Second, plaintiff argues that the mental RFC is a piece of boilerplate that this ALJ has used repeatedly with little variation in numerous cases. However, the Seventh Circuit has held that an ALJ's use of boilerplate will require reversal only if the ALJ fails to provide any specific reasons for the decision. See Filus, 694 F.3d at 868; see also Shideler, 688 F.3d at 311-12. Here, the ALJ provided a detailed discussion of the evidence supporting the RFC, including plaintiff's symptoms and the medical source opinions. (Tr. at 20-23.) Use of a "canned" RFC would also require reversal if it omitted limitations supported by the evidence. See Simila, 573 F.3d at 520-21. Plaintiff argues that the ALJ's use of a boilerplate RFC in this case failed to apprise the VE of the totality of her limitations. However, she identifies no specific limitations the ALJ skipped. Plaintiff complains that the ALJ failed to explain why he excluded "fast paced" tasks rather than requiring a slower pace, or why he imposed "few" work place changes rather than "no" work place changes. The ALJ specifically credited Dr. Polczinski's opinion that plaintiff had mild to moderate impairment in her ability to function socially, manage stress, deal with work changes, and persevere. (Tr. at 21.) The ALJ's RFC reasonably translated his opinion into specific work place limitations, as the cases permit. See, e.g., O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010) (explaining that there is no per se requirement that specific terminology relating to mental limitations be used in the hypothetical in all cases; it is permissible for an ALJ to use alternative phrasing specifically excluding those tasks that someone with the claimant's limitations would be unable to perform). Plaintiff argues that the ALJ provided no limitations related to her anxiety disorder, but the ALJ limited work place changes and interaction with others, which reasonably accounted for plaintiff's social anxiety.

33

See, e.g., Brown v. Astrue, No. 2:10-cv-1147, 2012 WL 139248, at *22 (S.D. W. Va. Jan. 18, 2012) (finding that limitations to "simple, routine, repetitive tasks" and to "only occasional changes in the work setting" accounted for anxiety-related symptoms, and limitation to "no more than occasional interaction with the public and co-workers" accounted for social phobia complaints). Plaintiff again fails to identify some specific anxiety-related limitation, supported by the evidence, which the ALJ declined to impose. The ALJ's RFC appears to be consistent with, indeed more restrictive than, the medical opinions of record, and he included all of the limitations in the RFC in his questions to the VE. (Tr. at 44-46.)

Finally, plaintiff argues that the ALJ erred in finding that she is able to communicate in English (Tr. at 23) and by failing to include communication limitations in his hypothetical questions to the VE. In applying for benefits, plaintiff indicated that she could speak and understand English (Tr. at 189), but the ALJ did not cite this (or any) evidence on the communication issue, and he concluded that an interpreter was needed at the hearing (Tr. at 57). I will therefore assume that the ALJ erred in finding that plaintiff could communicate in English. As plaintiff tacitly acknowledges, however, the error would be harmful only if the VE identified jobs that plaintiff could not perform given her limited English proficiency. Plaintiff argues that we cannot assume the VE knew of plaintiff's limitations in this area, but the VE was present for the hearing and observed plaintiff testifying with the assistance of a Spanish interpreter. Further, in his hypothetical questions, the ALJ asked the VE to assume a person with plaintiff's education, and social security regulations include inability to communicate in English as a factor in evaluating education. 20 C.F.R. § 416.964(b)(5). The VE also testified that she had reviewed the file and exhibits to familiarize herself with plaintiff's vocational background. (Tr. at 43.) Given this evidence, it seems highly unlikely that the VE would

34

identify jobs beyond plaintiff's ability to communicate. See Lopez v. Astrue, No. 10 cv 08024, 2012 WL 1030481, at *10 (N.D. Ill. Mar. 27, 2012) (rejecting a similar argument where the hypothetical required the VE to consider an individual with the claimant's age, education, and work experience; the claimant testified to his limited ability to communicate in English and spoke through a Spanish interpreter at the hearing; and the VE testified that she had reviewed the exhibits and heard the claimant's testimony); see also Ragsdale v. Shalala, 53 F.3d 816, 820-21 (7th Cir. 1995) (recognizing that an omission from a hypothetical question can be resolved by a record showing that prior to testifying the VE reviewed the portion of the administrative record containing the omitted information); Ehrhart v. Sec'y of Health and Human Servs., 969 F.2d 534, 540 (7th Cir. 1992) ("When the record supports the conclusion that the vocational expert considered the medical reports and documents, his responses are probative of both residual functional capacity and which jobs a claimant reasonably can perform, even if the hypothetical question itself does not take into account every aspect of the claimant's impairments.").

Plaintiff argues that the Ehrhart exception to the general rule that the ALJ must include all limitations does not apply where the ALJ poses a series of increasingly restrictive hypotheticals to the VE; in that situation, the VE's attention is focused on the hypotheticals and not on the record. O'Connor-Spinner, 627 F.3d at 619. In the present case, all of the hypothetical questions assumed a person of plaintiff's age, education, and work experience; each question added more limitations, but the ALJ never departed from this baseline assumption. Nothing in the transcript suggests that the VE, in answering the additional hypotheticals, would have assumed greater English proficiency.

35

## V. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 22nd day of August, 2013.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge